# SUPREME COURT OF THE UNITED STATES

### GARY RICHARD WHITTON *v.* RICKY D. DIXON, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

#### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 25–580.   Decided June 1, 2026

PER CURIAM.

A Florida jury convicted petitioner Gary Richard Whitton of murder and sentenced him to death. During his trial, the State called several witnesses, including a jailhouse inform- ant named Jake Ozio. Ozio was a high school student who, on a spring-break trip in Florida, was arrested and jailed for burglary and possession of a short-barrel shotgun. Ozio testified that, while he was incarcerated with Whitton, he overheard Whitton confess to "'stabb[ing] the bastard.'" *Whitton* v. *Secretary, Fla. Dept. of Corrections*, 2025 WL 1305158, \*2 (CA11, May 6, 2025) (*per curiam*). Ozio also testified that he had no criminal history prior to his spring- break arrest. That last piece of testimony turned out to be false. Ozio's juvenile records—which the State had in its possession at the time—showed that he had previously been charged with "assault with bodily injury against his father, terroristic threats against his mother, and at least one other burglary." *Id.*, at \*15.

After unsuccessfully pursuing a direct appeal and state postconviction relief, Whitton filed an application for a writ of habeas corpus in Federal District Court. Among other claims, he argued that Ozio's criminal-history testimony was false, that the prosecution knew the testimony was false, and that there was a reasonable likelihood the testi- mony affected the jury's verdict. Whitton claimed that, as a result, his due process rights had been violated under this Court's decision in *Giglio* v. *United States*, 405 U. S. 150

(1972). And he contended, as was additionally necessary
for federal habeas relief, that the *Giglio* error had a "'sub-
stantial and injurious effect or influence in determining the
jury's verdict.'" *Brecht* v. *Abrahamson*, 507 U. S. 619, 623
(1993). The District Court denied relief, finding that any
*Giglio* error "could not have made a difference" to the jury's
verdict because Florida juvenile criminal records are gener-
ally inadmissible to attack a witness's credibility. App. to
Pet. for Cert. 79a.

The Court of Appeals for the Eleventh Circuit affirmed,
but on different reasoning.[1] The court agreed with Whitton
that Ozio's criminal-history testimony was false, and that
the State knew it to be false. Moreover, the court disagreed
with the District Court's conclusion that any *Giglio* viola-
tion was harmless because of Florida evidence rules about
juvenile records. That conclusion, the Court of Appeals ex-
plained, was "erroneous" because Florida courts admit such
records when a witness opens the door to prior convic-
tions—including by stating that he has none. 2025 WL
1305158, *16. And "impeachment concerning Ozio's juve-
nile record," the Court of Appeals concluded, "would have
undermined [Ozio's] credibility." *Ibid.* So the court "[could
not] affirm the district court's decision on its finding of
harmless error." *Ibid.*

The Court of Appeals then considered whether to affirm
on another basis advanced by the State: that Whitton was
not prejudiced by any *Giglio* error because Ozio's testimony
as a whole (not just the false part) was immaterial to the
jury's verdict. The court explained that the Florida Su-
preme Court had made a determination relevant to that is-
sue during Whitton's state postconviction proceedings.
There, the Florida Supreme Court had stated that, even
without Ozio's testimony, the evidence against Whitton was

---

[1] We describe here only the brief part of the Court of Appeals' lengthy
opinion relevant to the issue at hand.

Per Curiam

"overwhelming." *Whitton* v. *State*, 161 So. 3d 313, 334 (2014). Under the Antiterrorism and Effective Death Penalty Act of 1996, the Court of Appeals owed deference to that state court determination unless it was "'based on an unreasonable determination of the facts in light of the evidence presented.'" 2025 WL 1305158, *7 (quoting 28 U. S. C. §2254(d)(2)); see 2025 WL 1305158, *17. That meant the key question for the Court of Appeals was whether the Florida Supreme Court's determination about the rest of the evidence was a reasonable one.

To answer that question, the Court of Appeals did something peculiar: It considered not only the evidence that was presented to the jury at Whitton's trial, but also evidence the jury never saw. The evidence in question relates to blood stains on Whitton's boots, which were seized the day after the murder. At Whitton's trial, an analyst from the Florida Department of Law Enforcement testified that the DNA in the blood stains matched neither the victim's nor Whitton's. A decade after Whitton was convicted, however, the State ran another DNA test on the blood stains—and this time, the results revealed a match with the victim's DNA. Even though that new DNA evidence was not presented at Whitton's trial, the Court of Appeals took account of it when analyzing the Florida Supreme Court's determination. In describing the evidence that supported that determination, the Court of Appeals related that Whitton's boots "were stained with blood that, after later retesting, matched [the victim]'s DNA." *Id.*, at *18.[2] And in rebutting

———————

[2] The sentence describing the evidence refers in full to the following: "the motel clerk saw Whitton's car parked at the motel, and Whitton admitted he was at the motel; Whitton's boots and his car were stained with blood that, after later retesting, matched [the victim]'s DNA; the blood stains on and inside Whitton's boots are consistent with 'a stabbing or a beating'; Whitton could not explain the downward blood spatter on the inside of his boots; and Whitton's car contained a power and gas receipt and a car wash ticket for 2:37 a.m. October 10, 1990, the night of the murder." 2025 WL 1305158, *18.

Whitton's arguments (some of which it thought a jury "may well find" "persuasive"), the court again commented on the new DNA evidence. *Ibid.* Specifically, it observed that, "after retesting the DNA on Whitton's boots," the State "confirmed that the inside of Whitton's right boot contained blood" with DNA "matching the DNA profile of [the victim]." *Id.*, at \*19 (internal quotation marks omitted). "In short," the court said, "the blood-splatter evidence ties Whitton directly and firmly to [the victim]'s murder." *Ibid.* After considering that post-trial DNA evidence (in addition to the trial evidence), the Court of Appeals held that it was not "unreasonable for the State court to conclude" that even without any of Ozio's testimony "there was 'overwhelming evidence against Whitton.'" *Ibid.* (quoting *Whitton*, 161 So. 3d, at 334). And so the Court of Appeals affirmed the denial of habeas relief.

We vacate the Court of Appeals' judgment because that court should not have considered the post-trial DNA evidence in assessing whether the Florida Supreme Court reasonably determined that Ozio's testimony was immaterial to the jury's verdict. Because the post-trial DNA evidence was not presented to the jury (indeed, did not exist at the time of the trial), that evidence could not have influenced the jury's verdict. It therefore sheds no light on whether (or to what extent) Ozio's testimony influenced that verdict. See *Brecht*, 507 U. S., at 623 ("[T]he standard for determining whether habeas relief must be granted is whether the [constitutional] error had substantial and injurious effect or influence *in determining the jury's verdict*" (emphasis added; internal quotation marks omitted)). The Florida Supreme Court did not consider the post-trial DNA evidence in making its determination, and the Court of Appeals should not have done so in evaluating that determination either. We express no view on whether the Florida Supreme Court's determination was reasonable in light of the evidence that *was* presented at trial. That is for the Court

Per Curiam

of Appeals to assess in the first instance. We likewise express no view on the State's argument that Whitton failed to exhaust his *Giglio* claim in the state courts. The Court of Appeals "[did] not address" that argument because it concluded that "the claim fails on the merits," 2025 WL 1305158, *15, n. 10, and we are "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). The Court of Appeals is of course free to address that argument on remand. We therefore grant the petition for writ of certiorari, vacate the judgment of the Court of Appeals, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

## GARY RICHARD WHITTON *v.* RICKY D. DIXON, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 25–580.   Decided June 1, 2026

JUSTICE THOMAS, with whom JUSTICE ALITO joins except as to Part III–B, dissenting.

A Florida jury convicted Gary Whitton of stabbing his friend to death. The Supreme Court of Florida rejected his motion for a new trial because of the "overwhelming evidence against" him. *Whitton* v. *State*, 161 So. 3d 314, 334 (2014) (*per curiam*). When Whitton challenged his conviction in federal court, the District Court denied his habeas petition, and the Eleventh Circuit affirmed in a 64-page opinion. This Court now vacates the Eleventh Circuit's judgment because of one-and-a-half sentences in its opinion. In rejecting one of Whitton's claims—which would fail on other grounds anyway—the Eleventh Circuit mentioned a fact that was notable but certainly not dispositive to its analysis: DNA testing had since further confirmed that Whitton is guilty. Because the Eleventh Circuit mentioned that fact, this Court summarily vacates. I respectfully dissent.

## I
### A

On the night of October 9, 1990, Gary Whitton murdered his friend James Maulden. Maulden, who was intoxicated, asked Whitton to drive him to a bank. Whitton helped Maulden withdraw his account's entire balance, $1,135.88, and drove them to a motel. At check-in, Whitton gave the motel clerk a false license plate number for his car, but the

clerk noticed that Whitton was lying and recorded the correct number. Because Maulden was still intoxicated when they arrived, Whitton helped him from the car to his room.

The next morning, the police found Maulden dead in his room. He had suffered a fractured skull, three fatal stab wounds to his chest, and stab wounds to his shoulder, cheek, neck, scalp, and back. Blood had sprayed all over the floor, furniture, walls, and ceiling.

The license plate from the car at the motel led the police to Whitton. He told the police that he had dropped Maulden off at the motel, but he initially denied having returned later that night. He eventually admitted that this story was a lie and that he had returned to the room, but he then claimed that Maulden was already dead when he arrived. The police arrested Whitton and seized, among other things, his boots.

Whitton's boots had blood spatter in them consistent with a stabbing that created "'forceful bloodshed.'" App. to Pet. for Cert. 4a; see Tr. of State Court Proceedings in *Whitton* v. *Secretary*, *Fla. Dept. of Corrections*, No. 4:15–cv–00200 (ND Fla.), ECF Doc. 73–2, p. 927. Whitton hypothesized that the blood had seeped upwards into his socks through the bottom of his boots when he happened upon Maulden's already-dead body. But, the blood spatter showed that Maulden was again lying: The blood had flowed downward. See *ibid.*; App. to Pet. for Cert. 4a.[1]

At trial, the State introduced even more evidence against Whitton. At 2:37 a.m. on the night of Maulden's murder, Whitton purchased a car wash ticket. The day after the murder, Whitton paid off hundreds of dollars' worth of debt. And, two witnesses—Jake Ozio and Kenneth McCullough— testified that Whitton confessed to the murder. When Ozio

_____

[1] The police could not examine Whitton's socks because, as Whitton admitted, he had thrown them out the window of his car after he left the motel.

gave that testimony, he denied that he had been arrested before.

The evidence at trial also included the blood spatter that the police discovered. The blood found in Whitton's boots matched Maulden's blood type but not Whitton's. Whitton's car also contained blood that matched Maulden's blood type. But, Whitton called a DNA analyst who said that the blood on the boots did not match Maulden's DNA.

Whitton took the stand in his own defense. He testified that he gave a false license plate number to the motel because he was worried about being held liable for any damage that Maulden caused. He testified that he did not know how much money Maulden had withdrawn and that he received $200 from someone else around the same time. He testified that he returned to the motel late that night because a friend had told him that Maulden's mother was looking for him. And, he testified that he fled the scene after only a minute, without calling the police, because he was in shock and did not want to get involved. As to the blood in his boots, Whitton continued to claim that he "assume[d] that it would have gotten on the bottom of [the boots] through the holes in the bottom of them." ECF Doc. 73–3, p. 127.

Whitton's story to the jury quickly fell apart. When the prosecutor asked why the blood had flowed downward in the boots, Whitton testified, "I don't know how it got there." *Id.*, at 128. When the prosecutor asked about the blood spots in his car, Whitton testified that they "could have been there when [he] bought the car . . . I have no idea." *Id.*, at 141. When the prosecutor asked about the bank withdrawal, Whitton admitted that he had signed Maulden's form to withdraw money and that he knew that Maulden was withdrawing the entire account. And, although Whitton testified that he had called Maulden's mother repeatedly, she testified at trial that she was at home the entire

afternoon and evening and never received a call from Whitton.

The jury convicted Whitton of murdering and robbing Maulden. It unanimously recommended a death sentence. The trial court sentenced Whitton to death, and the Supreme Court of Florida affirmed. *Whitton* v. *State*, 649 So. 2d 861 (1994) (*per curiam*).

In 2002, the State retested the blood on Whitton's boots and confirmed that it belonged to Maulden. Contrary to Whitton's DNA analyst's testimony at trial, the blood in the right boot matched the "'DNA profile of James Maulden.'" App. to Pet. for Cert. 6a, n. 5. The testing also identified Maulden as a DNA contributor to blood found on the left boot.

### B

Whitton filed a motion for postconviction relief in state court in 1997. As relevant here, Whitton brought a claim under *Giglio* v. *United States*, 405 U. S. 150 (1972). To succeed on a *Giglio* claim, a defendant must prove that the prosecutor presented false testimony against him; that the prosecutor knew that the testimony was false; and that there is a "reasonable likelihood" that the false testimony affected the verdict. *Id.*, at 154 (internal quotation marks omitted). Whitton's *Giglio* claim was based on testimony about his confession to Ozio. Whitton argued that Ozio had falsely testified "that Whitton confessed to him in prison"; that the State knew that the testimony was false; and that the false testimony was material. *Whitton*, 161 So. 3d, at 323. He did not make any claims about Ozio's description of his own criminal record.

The Supreme Court of Florida denied Whitton's motion for postconviction relief. It concluded that Whitton had failed to show either that Ozio's testimony about Whitton's confession was false or that the prosecutor knew that it was false. *Id.*, at 323–324. The court also rejected a separate

claim regarding other testimony. In so doing, the court relied on the "overwhelming evidence against Whitton" presented at trial even apart from his confessions. *Id.*, at 334. It did not rely on the DNA test results from 2002 confirming that the blood on Whitton's boot was Maulden's.

### C

Whitton then petitioned a federal court for a writ of habeas corpus. A state prisoner generally cannot receive federal habeas relief based on claims that he did not present in state court. Instead, before bringing a claim in habeas, he must have "exhausted the remedies available" in state court. 28 U. S. C. §2254(b)(1)(A). And, for a "claim that was adjudicated on the merits in State court proceedings," the federal court may not grant relief unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." §2254(d). Under these strict standards, a federal court cannot grant habeas relief unless the state court "blundered so badly that every fairminded jurist would disagree with the decision." *Klein* v. *Martin*, 607 U. S. 213, 221 (2026) (*per curiam*) (internal quotation marks and alteration omitted).

As relevant here, Whitton again claimed that Ozio falsely testified that Whitton had confessed to him. The District Court allowed discovery and held an evidentiary hearing. Ozio testified that he had not actually heard Whitton confess. He also clarified in his May 17, 2021, deposition that, although he had testified that he had not previously been arrested, he did have a juvenile record. Ozio then testified to the same effect at the evidentiary hearing.

In response to this clarification regarding Ozio's juvenile record, Whitton did not bring a new claim in state court based on Ozio's inconsistent statements. He instead added a new federal habeas claim, arguing that Ozio's testimony about his prior record also entitled him to a new trial under

*Giglio*. Whitton did not address his failure to present this claim to the state courts, nor did he request a stay of federal proceedings to rectify it. The District Court denied Whitton's federal habeas petition.

The Eleventh Circuit affirmed. In federal habeas proceedings, when a prisoner raises an unexhausted claim, the court cannot enter relief for the prisoner, but it can rule on the merits against the prisoner without addressing exhaustion. See §2254(b)(2). The Eleventh Circuit exercised that discretion and rejected Whitton's new *Giglio* claim on the merits. See App. to Pet. for Cert. 35a, n. 10. That claim failed, the Eleventh Circuit held, because the Supreme Court of Florida had reasonably concluded that the State had marshaled "overwhelming evidence" of Whitton's guilt apart from Ozio's testimony. *Id*., at 36a–37a. That conclusion was reasonable, the Eleventh Circuit continued, for several reasons:

> "[T]he motel clerk saw Whitton's car parked at the motel, and Whitton admitted he was at the motel; Whitton's boots and his car were stained with blood that, after later retesting, matched Maulden's DNA; the blood stains on and inside Whitton's boots are consistent with a 'stabbing or a beating'; Whitton could not explain the downward blood spatter on the inside of his boots; and Whitton's car contained a power and gas receipt and a car wash ticket for 2:37 a.m. October 10, 1990, the night of the murder." *Id*., at 40a.

Two pages later, the Eleventh Circuit addressed Whitton's argument that "the DNA evidence" at trial supported him. *Id*., at 42a. Relying on evidence presented to the jury, the Eleventh Circuit explained why a fairminded jurist may not be persuaded. The court cited evidence that traces of blood can be washed off and that Whitton had purchased a car wash ticket the night of the murder and told an officer that he had attempted to wash his boots. The Eleventh

Circuit then added a single additional aside on a point that some would find notable in this context: "Also, after retesting the DNA on Whitton's boots, the State confirmed that the inside of Whitton's right boot contained blood from a 'mixture of two or more individuals,' with the 'major donor' matching 'the DNA profile of James Maulden.'" *Ibid.* (citations omitted). The Eleventh Circuit did not claim to ascribe any particular legal weight to this fact.

Whitton petitioned for a writ of certiorari, claiming that the Eleventh Circuit erred in its analysis of his claim based on Ozio's testimony about his criminal record. He asked the Court to resolve a purported Circuit split over whether courts can assess prejudice based on evidence that the State discovered only after trial.

The Court summarily vacates the judgment below because of the one-and-a-half sentences in the Eleventh Circuit's opinion briefly mentioning the 2002 DNA test results.

## II

I would not grant Whitton such relief. If the Eleventh Circuit erred at all in mentioning the DNA test results, it was harmless for at least two reasons. First, the court thoroughly examined the overwhelming evidence against Whitton, which was more than sufficient to justify its decision. Second, Whitton had not even exhausted his claim in state court, so the Eleventh Circuit could not have ruled for him anyway. Because we do not "tower above" lower courts as an "impregnable citade[l] of technicality," we should not have exercised our summary powers to vacate here. *Kotteakos* v. *United States*, 328 U. S. 750, 759 (1946) (internal quotation marks omitted).

First, the evidence against Whitton at trial more than justified the Eleventh Circuit's decision. The Supreme Court of Florida concluded that, apart from Ozio's testimony and the 2002 test results, the State had presented "overwhelming evidence against Whitton." *Whitton*, 161

So. 3d, at 334. That conclusion, all agree, must be reviewed by the federal habeas court deferentially under §2254(d). Only if the Supreme Court of Florida's conclusion "was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement" could the Eleventh Circuit have granted relief on Whitton's *Giglio* claim, which required a showing that Ozio's allegedly false testimony made a difference in his trial. *Davis* v. *Ayala*, 576 U. S. 257, 269–270 (2015) (internal quotation marks omitted).

The Eleventh Circuit made clear that the testimony made no difference even before its brief mention of the DNA evidence. As the Eleventh Circuit explained, Whitton admitted to being at the motel; blood that matched Maulden's blood type had stained Whitton's boots and car; "Whitton could not explain the downward blood spatter on the inside of his boots; and Whitton's car contained a power and gas receipt and a car wash ticket for 2:37 a.m. October 10, 1990, the night of the murder." App. to Pet. for Cert. 40a. That analysis more than establishes all that is necessary to resolve this claim: The Supreme Court of Florida's conclusion that the evidence presented at trial against Whitton was overwhelming was not "so lacking in justification" as to "preclud[e] even the possibility for fairminded dispute." *Klein*, 607 U. S., at 221 (internal quotation marks omitted).

Second, the Eleventh Circuit was not even allowed to rule for Whitton regardless of the evidence because he failed to exhaust this claim before the state courts. Federal courts cannot grant habeas relief, no matter how meritorious the underlying claim, unless "the applicant has exhausted the remedies available in" state court, if such remedies are available and adequate. §2254(b)(1)(A). Whitton does not deny that state-court remedies were available. Yet, he never sought state remedies for his claim based on Ozio's characterization of his criminal record.

This exhaustion failure barred federal habeas relief, but Whitton never addressed it in the District Court. Nor did he ask for a stay of federal proceedings to enable him to cure the problem. Cf. *Rhines* v. *Weber*, 544 U. S. 269, 276–278 (2005). If he asked for a stay now, it would be an abuse of discretion to grant it—Whitton discovered the factual basis for this claim in May 2021, at the latest, and he has still not exhausted his claim in state court, so it is likely too late for him to even attempt to do so. See *Mungin* v. *State*, 320 So. 3d 624, 625–626 (Fla. 2020) (*per curiam*). In such circumstances, federal courts can and do simply deny the habeas claim. See *McBride* v. *Skipper*, 76 F. 4th 509, 512–513 (CA6 2023) (federal court need not consider a stay when petitioner does not ask for one); *Banks* v. *Allison*, 140 F. 4th 1181, 1185–1189 (CA9 2025) (federal court need not consider a stay after petitioner fails to pursue state remedies for over a year while federal petition is pending); *Sears* v. *Warden, GDCP* 73 F. 4th 1269, 1306 (CA11 2023) (*per curiam*) (federal court need not consider a stay when petitioner's claim would be procedurally barred in state court).[2]

---

[2] Moreover, it is not even clear that the Eleventh Circuit lacked the discretion to use the DNA test results as a basis for denying relief. The only reason that the test results were before the Eleventh Circuit is that the State had argued that habeas relief could be denied on an alternative ground: Given the new evidence confirming Whitton's guilt, "law and justice" did not "require" relief. 28 U. S. C. §2243; see Answer Brief for Respondents-Appellees in *Whitton* v. *Secretary*, *Fla. Dept. of Corrections*, No. 23–10786 (CA11), ECF Doc. 31, p. 72. Under this Court's precedents, a state prisoner cannot obtain relief unless he "'persuade[s] a federal habeas court that law and justice require'" relief. *Shinn* v. *Martinez Ramirez*, 596 U. S. 366, 377 (2022). That inquiry turns on "equitable and prudential considerations," such as "the States' powerful and legitimate interest in punishing the guilty." *Brown* v. *Davenport*, 596 U. S. 118, 132 (2022) (internal quotation marks omitted).

We do not intervene based on "technicalit[ies]" that do not "really affec[t]" the outcome of a case. *Kotteakos*, 328 U. S., at 759, 761. Instead, on a petition for a "writ of certiorari in any case," this Court must ignore "errors or defects which do not affect the substantial rights of the parties." 28 U. S. C. §2111; see *United States* v. *Lane*, 474 U. S. 438, 444 (1986). This Court therefore, in most cases, declines to exercise its certiorari authority when it is "evident that the resolution of the conflict could not change the result reached below." S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice 4–18 (11th ed. 2019). Yet, the Court today elects to intervene in that exact posture.

Fortunately, though, the Court's decision will have no real-world effect. The Eleventh Circuit can reissue a virtually identical opinion after deleting one sentence on page 42 and one part of one sentence on page 40, where the Eleventh Circuit discussed the 2002 DNA tests. See App. to Pet. for Cert. 40a, 42a. Or it can deny relief because Whitton failed to exhaust a claim based on Ozio's criminal record. Or it might consider using its "equitable discretion" to deny relief because of the conclusive evidence of Whitton's guilt, including the DNA test results. *Edwards* v. *Vannoy*, 593 U. S. 259, 289 (2021) (GORSUCH, J., concurring); see *Shinn* v. *Martinez Ramirez*, 596 U. S. 366, 377 (2022).

### III

This Court has increasingly granted summary relief in certain cases based on lower court errors that seemingly had no effect on the outcome of the case. See *Pitts* v. *Mississippi*, 607 U. S. 1 (2025) (*per curiam*) (granting summary vacatur for man who sexually abused his daughter after likely harmless trial error); *Doe* v. *Dynamic Physical Therapy, LLC*, 607 U. S. 11 (2025) (*per curiam*) (granting summary vacatur after likely harmless state intermediate appellate court error). It would be one thing if this practice

reflected the Court's consistent commitment to correcting legal error in all cases. But, in reality, this Court routinely declines to provide relief to law-abiding Americans when it would actually matter, even after lower courts conspicuously flout this Court's precedents in ruling against them.

## A

Consider *Boston Parent Coalition for Academic Excellence Corp.* v. *The School Committee*, 604 U. S. \_\_\_ (2024). In that case, the Boston School Committee implemented an admissions policy to reduce the number of white and Asian students at their elite exam schools. The committee made its racist intent clear. One member said that she was "'[s]ick of . . . whites,'" while another mocked the names of Asian students after forgetting to mute himself on a Zoom hearing. *Id.*, at \_\_\_ (ALITO, J., dissenting from denial of certiorari) (slip op., at 2). Despite this clearly unconstitutional race discrimination, the First Circuit ruled against parents who had challenged the affirmative-action policy. And, in a near-identical case, the Fourth Circuit did the same. *Coalition for TJ* v. *Fairfax County School Board*, 601 U. S. \_\_\_ (2024). Yet, even when presented with multiple opportunities to vindicate the rights of families to pursue education for their children on color-blind terms, this Court "refused to correct a glaring constitutional error." *Boston Parent Coalition*, 604 U. S., at \_\_\_ (ALITO, J., dissenting) (slip op., at 5); see also *Coalition for TJ*, 601 U. S., at \_\_\_–\_\_\_ (same) (slip op., at 9–10).

## B

Or consider *Beck* v. *United States*, 607 U. S. \_\_\_ (2025). In that case, Air Force Staff Sergeant Cameron Beck drove home to lunch with his family in Missouri and was killed in a car crash by a negligent driver. Because the driver was a federal employee and Beck was serving in the military, the lower courts had denied Beck's widow any relief. They did

so based on an atextual exception to liability of this Court's creation, which has been widely acknowledged as "difficult . . . to justify." *Id.*, at ___ (SOTOMAYOR, J., statement respecting denial of certiorari) (slip op., at 1); see *id.*, at ___–___ (THOMAS, J., dissenting from denial of certiorari) (slip op., at 3–5). Even worse, our own precedent had squarely held that this exception did not apply to a case like Beck's. See *Brooks* v. *United States*, 337 U. S. 49, 50–51 (1949). Yet, this Court, as in many similar cases, refused to even take Beck's widow's case. See, *e.g.*, *Carter* v. *United States*, 604 U. S. ___ (2025) (THOMAS, J., dissenting from denial of certiorari); *Clendening* v. *United States*, 598 U. S. ___ (2022) (same); *Doe* v. *United States*, 593 U. S. ___ (2021) (same); *Lanus* v. *United States*, 570 U. S. 932 (2013) (same).

### C

Or consider *Speech First, Inc.* v. *Whitten*, 604 U. S. ___ (2025). In that case, the Court declined to hear a student association's challenge to Indiana University's "bias response team," which fields anonymous complaints about student speech and considers whether to refer the accused to campus offices or the police. *Id.*, at ___–___ (THOMAS, J., dissenting from denial of certiorari) (slip op., at 1–2). "[O]ver 450 universities" reportedly had "similar bias-reporting schemes." *Speech First, Inc.* v. *Sands*, 601 U. S. ___, ___ (2024) (THOMAS, J., dissenting) (slip op., at 2). Under these university policies, an untold number of American students with "unpopular" views had to "self-censor their discussion of these views out of fear that others will likely report them" to the bias response team. *Speech First, Inc.* v. *Whitten*, 604 U. S., at ___ (slip op., at 2) (internal quotation marks omitted). Lower courts had held that these students did not even have standing to bring a lawsuit in federal court, in plain tension with this Court's precedents. See *Laird* v. *Tatum*, 408 U. S. 1, 11 (1972). Yet, the Court refused to hear these students' case.

THOMAS, J., dissenting

\*    \*    \*

It is unfortunate that the Court chose to intervene at the request of a convicted murderer to correct the Eleventh Circuit's inconsequential foot fault.  What makes it even worse is that the Court does so even while it refuses to correct far more consequential errors for law-abiding citizens, such as the discriminated-against families in Boston, Staff Sergeant Beck's widow, and the students seeking to challenge university censorship.

I respectfully dissent.